# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHAD STANBRO**, | Case No. |
| Plaintiff, | 7:19-cv-10857 |
| | (KMK-JCM) |
| v. | |
| **WESTCHESTER COUNTY HEALTH CARE CORPORATION, WESTCHESTER MEDICAL CENTER, FRANK WEBER, and JOHN FULL**, | |
| Defendants. | |

| | |
|---|---|
| **CHAD STANBRO**, | Case No. |
| Plaintiff, | 7:19-cv-10857 |
| | (KMK-JCM) |
| v. | |
| **CORRECTION OFFICER NADYA PALOU, CORRECTION OFFICER RAYMOND DEAL, CORRECTION OFFICER KRISTOFER LEONARDO, CORRECTION OFFICER RICHARD LANDRY, CORRECTION NURSE GARY PAGLIARO and CORRECTION SERGEANT ENRIQUE TORRES**, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS WESTCHESTER MEDICAL CENTER, FRANK WEBER, and JOHN FULL'S MOTIONS IN LIMINE SEEKING TO PRECLUDE PLAINTIFF'S MEDICAL EXPERT FROM TESTIFYING AT TRIAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

    Claims against WMC, Full, and Weber ..................................................... 4

    Dr. Todd's Report and Deposition Summary............................................. 5

ARGUMENT ....................................................................................................... 7

    I.    Dr. Todd Is Qualified To Render Opinions Regarding Full And Weber's Deviation From Standards of Care in Discharging Patients Post-Anesthesia, and His Opinions Are Reliable ........................................................................... 7

    II.    The Evidentiary Requirements Applicable to Experts in State Medical Malpractice Claims Are Not Applicable To Plaintiff's Federal Eighth Amendment Claim of Deliberate Indifference to Medical Needs ................................. 10

    III.    Defendants' Challenges to the Reliability of Todd's Other Opinions Likewise Are Without Merit ......................................................................................... 13

    A.    Plaintiff's injuries were caused, in the first instance, by the blunt force trauma to which he was subjected inside the WMC clinic.................................... 14

    B.    Plaintiff endured additional pain and suffering by having his treatment delayed and being transported back to Fishkill in the back of a prison van without any neck immobilization........................................................................... 16

    C.    As a result of the August 31, 2018 injury to his cervical spine, plaintiff remains more susceptible to paralysis from any future trauma to the cervical spine.......................................................... 17

CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Dobias v. W. Farmers,*
  6 Wn App. 194, 491 P.2d 1346 (1971) ........................................................ 8

*Doe v. R.I. Sch. of Design,*
  516 F. Supp. 3d 188 (D.R.I. 2021) .......................................................... 14

*Flemings v. Merck & Co. (In re Fosamax Prods. Liab. Litig.),*
  2009 U.S. Dist. LEXIS 109366 (S.D.N.Y. 2009) ........................................ 7

*Hathaway v. Coughlin,*
  37 F.3d 63 (2d Cir. 1994) ........................................................... 3, 11, 13

*I.M. v. United States,*
  362 F. Supp. 3d 161 (S.D.N.Y. 2019) ............................................... 7, 8, 9

*Love v. Rockwell's Int'l Enters., LLC,*
  83 A.D.3d 914 (2d Dep't 2011) ................................................................ 13

*Loyd v. United States,*
  2011 U.S. Dist. LEXIS 36237 (S.D.N.Y. 2011) .......................................... 7

*Lyster v. Metzger,*
  68 Wash. 2d 216, 412 P.2d 340 (1966) .................................................... 8

*McCullock v. H.B. Fuller Co.,*
  61 F.3d 1038 (2d Cir. 1995) ..................................................................... 7

*Postlethwaite v. United Health Servs. Hosps., Inc,*
  5 A.D.3d 892 (3rd Dep't 2004) ................................................................ 8

*Tufariello v. Long Island R.R.,*
  458 F.3d 80 (2d Cir. 2006) ..................................................................... 13

*United States v. Akwuba,*
  7 F.4th 1304 (11th Cir. 2021) ................................................................. 13

*United States v. Caniff,*
  955 F.3d 1183 (11th Cir. 2020) .............................................................. 14

*Zikianda v. Cty. of Albany,*
  2015 U.S. Dist. LEXIS 122363 (N.D.N.Y. 2015) ............................... 11, 12

## PRELIMINARY STATEMENT

Plaintiff submits this Memorandum of Law in opposition to the motion of defendants Westchester Medical Center (WMC) and John Full (Full), Dkt. No. 125,[1] and the motion of defendant Frank Weber (Weber), Dkt. No. 127, both of which seek an order precluding plaintiff's expert, Dr. Robert Todd, from testifying at the trial of these consolidated actions.[2] The gravamen of defendants' motions is that, since Dr. Todd is not a dentist or an oral surgeon, he is not qualified to opine on whether Drs. Full and Weber prematurely discharged plaintiff from their care. And even were Dr. Todd qualified, so argue defendants, he has not identified either in his report or in his deposition testimony any standard of care from which Drs. Full and Weber deviated, and therefore cannot be offered as a witness by plaintiff in support of his claims for malpractice against WMC, Full, and Weber. Defendants' arguments are without merit.

First, notwithstanding that Dr. Todd, a board certified neurologist and licensed pharmacist, is not also a dentist or an oral surgeon, he has more than sufficient experience and qualifications to opine as to the propriety of Drs. Full and

[1] All citations to docket numbers refer to the docket sheet under Case No. 7:19-cv-10857.

[2] Defendants WMC and Full's motion in limine were joined with their motion to dismiss and/or for summary judgment. By order dated June 6, 2022, this Court denied as untimely and otherwise improper those portions of the motion that sought dismissal and summary judgment. Dkt. No. 118. Accordingly, plaintiff is responding herewith only to that portion of WMC and Full's motion that seeks an in limine order. Plaintiff also is responding herewith to a similar in limine motion, filed by defendant Weber on June 10, 2022. Dkt. No. 127.

Weber's having discharged plaintiff—who was in an apparent state of quadriplegia after having been administered intravenous anesthesia and then being subjected to a use of force by corrections officers—into the custody of those officers without first having plaintiff evaluated by, much less treated by, any of the physicians on staff at Westchester Medical Center. Moreover, contrary to defendants' argument that Dr. Todd has failed to specify any standards or guidelines from which Drs. Full and Weber departed, all parties are in agreement with Dr. Todd that the so-called "Aldrete Scale," which measures whether any patient can be safely discharged from post-anesthesia care, is the standard to which Drs. Full and Weber were required to adhere. And the Aldrete Scale is referenced by Dr. Todd not only throughout his report, but also throughout his deposition testimony. The parties disagree only on whether Full and Weber properly adhered to the Aldrete Scale, a point on which Dr. Todd, in his capacity as a physician and pharmacist, is more than adequately qualified to opine.

Second, defendants' argument concerning Dr. Todd's purported failure to identify applicable professional standards of care elide the fact that plaintiff's complaint against WMC, Full, and Weber is not limited to a New York state-law claim for professional malpractice against those defendants, but rather also asserts federal claims for, among other things, deliberate indifference to serious medical needs in violation of the Eighth Amendment to the U.S. Constitution. Since evidence of deviation from accepted standards of professional care is not a requirement of a such a federal claim, *see Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d

Cir. 1994), any purported failure of Dr. Todd to set forth accepted professional standards would not, in any event, preclude him from testifying in support of plaintiff's federal claims.

WMC and Full, though not Weber, also argue that Dr. Todd's report does not set forth sufficient facts to support his opinions that 1) plaintiff's injuries were caused, in the first instance, by the blunt force trauma to which he was subjected in the WMC clinic; 2) plaintiff endured additional pain and suffering by having his treatment delayed and by being transported back to Fishkill in the back of a prison van without any neck immobilization; and 3) as a result of the August 31, 2018 injury to his cervical spine, plaintiff remains more susceptible to paralysis from any future trauma to the cervical spine. A review of Dr. Todd's report demonstrates that it contains a more than adequate basis for Todd's opinions, and that those opinions therefore are reliable and admissible at trial.

## STATEMENT OF FACTS

Plaintiff assumes the Court's familiarity with the facts of this case and the contentions of the parties, since the Court received extensive written submissions from the parties in connection with defendants' prospective, but never-filed, motions for summary judgment, and then presided over the December 7, 2021 pre-motion conference during which all counsel reiterated the claims and defenses of their respective clients. Nevertheless, the following is a brief reiteration of plaintiff's contentions as against moving defendants WMC, Full, and Weber.

3

**Claims against WMC, Full, and Weber**

On August 30, 2018, plaintiff, Chad Stanbro, walked into a dental clinic at WMC in order to undergo a procedure to be performed by Full and Weber. Approximately one hour later, Stanbro was wheeled out of the dental clinic in a state of quadriplegia resulting from a neck injury sustained by a use of force by several correction officers. Before discharging Stanbro from their care, neither Full nor Weber arranged for any physician at WMC to examine, let alone treat, Stanbro in connection with his quadriplegia. Instead, they allowed two of the four officers who used force against Stanbro to remove him from the hospital in a wheelchair and drive him forty-five miles back to Fishkill Correctional Facility in the back of a prisoner van without immobilizing his neck in any manner. After being evaluated by medical staff at Fishkill, Stanbro eventually was medevacked by helicopter back to WMC, where he was diagnosed with quadriplegia and underwent emergency surgery for the injury to his cervical spine.

At their depositions, Full and Weber appeared to offer two explanations for allowing Stanbro to be discharged into the correction officers' care without first having him evaluated by, much less treated by, a physician at WMC. First, they claimed that their involvement with Stanbro essentially ended once Stanbro became agitated and was subdued by the officers; at that point, the surgical procedure was aborted and Stanbro was transferred into DOCCS's custody and care. Second, they denied knowing about the severity of Stanbro's medical condition following the use-of-force incident, and even claimed that they gave Stanbro the highest possible

4

score—a 10 out of 10—on an "Aldrete Scale," which measures whether a patient can be safely discharged from post-anesthesia care.[3] Weber asserted that, had he determined that Stanbro did not meet the Aldrete Scale's criteria for safe discharge, he never would have allowed him to be removed from the hospital by the officers.

### Dr. Todd's Report and Deposition Summary

Dr. Todd prepared a 19-page report, *see* Dkt. No. 128, Weber Decl. Ex. C ("Plaintiff's Expert, Dr. Todd's Report and CV"), in which he opined, among other things, as to the care that was rendered to plaintiff by Drs. Full and Weber. In his report, Todd itemized the numerous documents and other items, including medical and hospital records, deposition transcripts, prison records, and videotapes, that he reviewed as part of his evaluation. *Id*. at 1-2. Todd also referenced, and reproduced in his report, the actual "Aldrete Scale" upon which all healthcare providers rely as a gauge to whether a patient can be safely discharged from the provider's care. *Id*. at 10. Then, citing to numerous entries in both the hospital records and deposition transcripts, referencing to the minute and second portions of videotape footage depicting plaintiff being removed from WMC in a wheelchair, and noting that he, as a neurologist, was readily able to discern plaintiff's state of "obvious flaccid paresis," *id*. at 11-14, Todd concluded that it was "impossible" for Stanbro to have scored a "10" on the Aldrete Scale. *Id*. at 11. According to Todd's report, instead of being

---

[3] Full acknowledged that he filled out the Aldrete Scale for Stanbro, and further acknowledged that to receive a 10 out of 10 on the Aldrete Scale, a patient must not show any deficits in his arms or his legs, and would have to be able to move his arms and legs freely. When pressed, however, Full claimed that he could not recall whether Stanbro was able to move his arms or legs before he was discharged.

discharged from Full and Weber's care and into the custody of the correction officers, Stanbro should have been taken immediately to the WMC emergency room, *id*. at 15, where the injury to his cervical spine caused by the use of force could have been promptly addressed. *Id*. at 18. Instead, Stanbro was driven back to Fishkill in the back of a prisoner van, without any neck immobilization, further contributing to his pain and suffering. *Id*. at 15, 18.

Todd's deposition testimony, *see* Dkt. No. 128, Weber Decl. Ex. D ("Dr. Todd's Deposition Transcript"), was consistent with the findings in his report. Regarding his qualifications, he testified that he is a pharmacist licensed by the State of New York, and that he has been a board-certified neurologist since 2005. *Id*. at 7. Todd is also affiliated with three teaching hospitals. *Id*. at 10.

Todd testified that he is very familiar with the anesthetic drugs, Versed and fentanyl, that were administered to Stanbro, including the affects they have on patients and the drugs' half-lives, and that he has administered those precise drugs to patients under his care. *Id*. at 37-38, 85. Todd testified that, while he cannot opine on accepted standards of care for dental treatment, *id*. at 47, and while he has never physically filled out an Aldrete Scale, *id*. at 56, as a pharmacist and a physician whose patients frequently have to undergo anesthesia, he is very familiar with the Aldrete Scale and the guidelines that are employed in administering the scale. *Id*. at 56, 61-63, 79-91. Among those guidelines are that the scale be filled out only by the provider who actually observes the patient exhibit the signs and behavior to be documented in the scale, *id*. at 91, that part of the test involves the

6

provider asking the patient to respond physically to verbal commands, *id*. at 79-80,

and that the scale be scored no earlier than at the moment of discharge. *Id*. at 57,

61-63. While it is undisputed that Full filled out the Aldrete Scale for plaintiff, Full

admits that he did not actually observe Stanbro at the time of discharge, and that

he relied instead on Weber's purported assessment of Stanbro's ability to be safely

discharged. *See* Dkt. No. 125, Defs.' WMC and Full's Mots. in Limine, at 7.

## ARGUMENT

I.  **Dr. Todd Is Qualified To Render Opinions Regarding Full And Weber's Deviation From Standards of Care in Discharging Patients Post-Anesthesia, and His Opinions Are Reliable**

In *I.M. v. United States*, 362 F. Supp. 3d 161 (S.D.N.Y. 2019) (Karas, J.), this

Court explicitly rejected the argument that one need be a specialist in the same

area of medicine involved in a medical malpractice lawsuit to qualify as an expert

witness in that lawsuit:

> An expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Loyd v. United States*, No. 08-CV-9016, 2011 U.S. Dist. LEXIS 36237, 2011 WL 1327043, at *5 (S.D.N.Y. Mar. 31, 2011) (internal citations and quotations omitted); *see also Flemings v. Merck & Co. (In re Fosamax Prods. Liab. Litig.)*, No. 06-CV-7631, 2009 U.S. Dist. LEXIS 109366, 2009 WL 4042769, at *6 (S.D.N.Y. Nov. 23, 2009) (holding that doctors need not be "specialist[s] in the exact area of medicine implicated by the plaintiff's injury") (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)).

*Id.* at 192.[4] Similarly, in *Postlethwaite v. United Health Servs. Hosps., Inc*, 5 A.D.3d 892, 895 (3rd Dep't 2004), the court noted that "....a medical expert need not be a specialist in a particular field in order to testify regarding accepted practices in that field…[so long as he is] 'possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable.'" (citations omitted).

Here, that Dr. Todd is neither a dentist nor an oral surgeon does not disqualify him from testifying as to the standards of care that apply to decisions to discharge patients who are emerging from the effects of intravenous anesthesia. Dr. Todd is a board-certified physician who has administered the same anesthetic drugs to his patients that were administered to Stanbro, and he is very familiar with the Aldrete Scale. Beyond that, Todd is a licensed pharmacist, and in that capacity necessarily has knowledge and training beyond that possessed by your average physician, oral surgeon, or dentist as to the effects of various anesthetics on patients. Indeed, Todd may be said to be uniquely qualified to opine as to the propriety of Drs. Full and Weber having discharged Stanbro from their care after he

---

[4] In arguing that Todd is not qualified since he is neither a dentist nor an oral surgeon, WMC, Full, and Weber conspicuously omit any reference to this Court's decision in *I.M. v. United States.* Instead, WMC and Full cite two Washington State court cases, decided more than half a century ago, for the proposition (rejected by New York courts) that experts must state their opinions *only within their field of expertise. See* Dkt. No. 109, Defs.' WMC and Full's Mots. in Limine, at 7 (citing *Lyster v. Metzger*, 68 Wash. 2d 216, 412 P.2d 340 (1966); *Dobias v. W. Farmers*, 6 Wn App. 194, 491 P.2d 1346 (1971)).

emerged from the anesthesia in the condition documented not only in the hospital records, but also in the videotape recording of his removal from the hospital.

Having established that Dr. Todd is qualified to render an opinion regarding the standard of care employed by Drs. Full and Weber, it also is apparent that Todd's opinions are reliable and not based on pure speculation. In that regard, reference to this Court's decision in *I.M. v. United States* again is instructive:

> The Court concludes that there is enough in the record to reject the claim that Dr. Danoff's testimony is unreliable. He explained what he believes Defendants' deviations from the standard of care were, what evidence he reviewed, how he arrived at his opinions, and his statements are not clearly contradicted by the record. *Cf. Foley*, 294 F. Supp. 3d at 93-94 (finding expert testimony was not reliable where expert failed to explain connection between medical condition decedent was allegedly suffering from and the care provided by the defendants, proposed expert based opinion on statements that were contracted by the record, and failed to explain how he arrived at his opinions); *Vale*, 2015 U.S. Dist. LEXIS 135717, 2015 WL 5773729, at *3 (finding expert testimony was not reliable because doctor provided no foundational basis for his opinion, no explanation for how defendants was negligent except for one isolated unsupported statement, and his conclusions were "merely speculative").

*Id*. at 195. Here, too, Dr. Todd set forth the standard of care—the Aldrete Scale—applicable to Full and Weber's decision to discharge plaintiff from their care. That the Aldrete Scale represents a standard of care applicable to dentists and oral surgeons is not disputed. Indeed, defendants themselves acknowledge the Aldrete Scale as the governing standard for discharging patients post-anesthesia; their defense, however, is that they allegedly did adhere to the scale in connection with their decision to discharge plaintiff. Dr. Weber also acknowledged that, had Stanbro

not met the Aldrete's Scale criteria for safe discharge, he never would have discharged him.

Dr. Todd also set forth in his report (and in his testimony) defendants' deviation from that standard of care—including giving the paralyzed Stanbro a perfect score on the Aldrete Scale and discharging him into the custody not of medical doctors, but of correction officers—and the materials upon which he relied in arriving at that opinion. Moreover, Todd's opinion is not contradicted by the record. Indeed, while WMC, Full, and Weber have retained two of their own dentists/oral surgeons as expert witnesses in this case, *see* Dkt. No. 99, Proposed Joint Pre-Trial Order, at 14,[5] these defendants have not submitted any reports or affidavits from either of these experts to contradict Todd's findings or to call into question Todd's qualifications or the reliability of his opinions.

## II. The Evidentiary Requirements Applicable to Experts in State Medical Malpractice Claims Are Not Applicable To Plaintiff's Federal Eighth Amendment Claim of Deliberate Indifference to Medical Needs

As demonstrated above, Dr. Todd's qualifications, and the bases of his opinions, are more than adequate to allow him to testify to WMC, Full, and Weber's deviation from accepted standards of care, and thus sufficient to support plaintiff's state-law claims of malpractice against these defendants. But even had Todd not adequately identified applicable standards of care and/or specified the manner in

_____

[5] A Google search reveals that Dr. Sidney Eisig, who is WMC and Full's expert, is Chief of the Hospital Dental Service at New York-Presbyterian Hospital and Director of Oral and Maxillofacial Surgery at the hospital, and Dr. Harry Dym, who is Weber's expert, is the Chair of Dentistry and Oral & Maxillofacial Surgery at the Brooklyn Hospital Center.

which defendants deviated from those standards, such identification is not required to prove a federal claim of deliberate indifference to serious medical needs in violation of the Eighth Amendment.

In *Hathaway* v. Coughlin, 37 F.3d 63 (2d Cir. 1994), the Second Circuit noted that state-law evidentiary rules with respect to malpractice claims are not applicable to Eighth Amendment claims of deliberate indifference, and that a plaintiff asserting an Eighth Amendment claim need not identify a particular deviation from accepted professional norms, nor even offer any expert testimony, to support his claim. *Id.* at 68. The Court further stated that while "[e]xpert testimony certainly could have bolstered [the plaintiff's] case at trial… the absence of such expert proof does not mandate dismissal of his action where the facts support a finding of deliberate indifference." *Id.*

Here, even had Dr. Todd not identified any generally accepted standards of care that were violated by Drs. Full and Weber—and clearly, he did—Todd's opinion that these doctors essentially abandoned plaintiff by discharging him into the custody of correction officers without first doing a proper assessment of his ability to be safely discharged is itself sufficient to sustain plaintiff's claim of deliberate indifference to serious medical needs.

*Zikianda v. Cty. of Albany*, 2015 U.S. Dist. LEXIS 122363 (N.D.N.Y. 2015) is instructive in that regard. In *Zikianda*, the plaintiff's expert characterized as "inexplicable" a prison nurse's decision to change the dosage of her incarcerated patient's medication and discharge him from her care without first performing

11

proper testing. The court found that the expert's opinion was sufficient to demonstrate that the nurse essentially had abandoned her patient, and that this was sufficient to sustain a federal claim for deliberate indifference to serious medical needs.

> Schneider finds this "inexplicable," especially given the length of time between changing the medication and ordering new testing. (*Id.*). The expert concludes that, "Nurse Paulino had to have been aware that, having ordered no diagnostic testing, she could not make a reliable assessment" about the stability of Decedent's condition. (*Id.*). In effect, Schneider finds, "Nurse Paulino abandoned Irene Bamenga, leaving her survival to blind luck." (*Id.*). These failings led to Bamenga's death. (*Id.*).

> The Court finds that, for reasons substantially similar to those stated in reference to the other health professionals, Nurse Practitioner Paulino's conduct could be viewed by a reasonable juror as deliberate indifference.

*Id.*, at *182.

Here, too, Dr. Todd opines in his report that it would have been "impossible" for a paralyzed Stanbro to have scored a perfect "10" on the Aldrete Scale before Drs. Full and Weber discharged him into the custody not of physicians who could have attended to his dire and acute medical needs, but instead to the correction officers who caused that condition. Such conduct is equivalent to the "abandonment" of a patient referenced in *Zikianda*, and similarly supports a finding of a deliberate indifference to serious medical needs.

12

### III. Defendants' Challenges to the Reliability of Todd's Other Opinions Likewise Are Without Merit

Defendants WMC and Full, though not defendant Weber, also challenge the reliability, and therefore the admissibility, of Dr. Todd's opinions that 1) plaintiff's injuries were caused, in the first instance, by the blunt trauma to which he was subjected inside the WMC clinic; 2) plaintiff endured additional pain and suffering by having his treatment delayed and by being transported back to Fishkill in the back of a prison van without any neck immobilization; and 3) as a result of the August 31, 2018 injury to his cervical spine, plaintiff remains more susceptible to paralysis from any future trauma to the cervical spine. Putting aside that some, or all, of these opinions arguably state what is border lining on obvious, and thus may not even *require* additional proof in the way of expert testimony, *see, e.g.*, *Love v. Rockwell's Int'l Enters., LLC*, 83 A.D.3d 914 (2d Dep't 2011) (holding that expert testimony is not required for a jury to find that plaintiff's fractured jaw was a result of his face having been slammed against a wall); *Tufariello v. Long Island R.R.*, 458 F.3d 80 (2d Cir. 2006) (holding that expert testimony was not required for jury to find that plaintiff's hearing loss was a result of plaintiff's repeated direct exposure to loud train horns),[6] Dr. Todd's report provides a more than adequate foundation for these opinions.

---

[6] Yet, the arguable "obvious" nature of these conclusions would not *prohibit* plaintiff from offering expert testimony in further support of these conclusions. *See, e.g.*, *Hathaway*, 37 F.3d at 68 (noting that, notwithstanding that a finding of deliberate indifference did not *require* expert testimony, "[e]xpert testimony certainly could have bolstered [plaintiff's] case at trial…."); *United States v. Akwuba*, 7 F.4th 1304, 1318 (11th Cir. 2021) ("But Rule 704(b) does not preclude even expert testimony

13

A. Plaintiff's injuries were caused, in the first instance, by the blunt force trauma to which he was subjected inside the WMC clinic

In support of this opinion, Dr. Todd notes in his report that he relied on, among other things, the following factors, all of which are supported by entries in hospital records, plaintiff's history as given to Todd, plaintiff's deposition testimony, defendants' deposition testimony, and videotape footage taken from WMC:

-Immediately prior to entering the WMC clinic, Stanbro was "neurologically intact reporting no difficulty walking, moving his arms/legs and having full control of bowel and bladder." (p. 7).

-During the procedure inside the clinic, "[f]orce was used on Chad Stanbro by the officers, including blunt trauma to the neck." (p. 3).

- "He reported that one of the guards jumped on top of him and put his knee on his neck/throat for an extended period of time, causing severe neck pain and an inability to move his arms and legs." (p. 7).

- Immediately after the procedure, Stanbro "had an obvious flaccid paresis that was present on the video taken at Westchester Medical Center contemporaneous with the procedure." (p. 10)

- "Chad Stanbro is brought out of operatory with his neck extended over the back of a wheelchair at 1:38:33. His eyes are closed and he does not move during the time he was visible. He was wheeled down the West hallway at 1:38:51." (p. 11)

that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on this ultimate issue, and instead leaves this inference for the jury to draw.'") (quoting *United States v. Caniff*, 955 F.3d 1183, 1195 (11th Cir. 2020) (per curiam) (internal quotation marks omitted)); *Doe v. R.I. Sch. of Design*, 516 F. Supp. 3d 188, 195 n.3 (D.R.I. 2021) ("While here the Court finds that the lack of care by RISD is obvious to a lay person, the expert's opinion supports that finding.")

14

-"A CT of the Cervical Spine at St. Luke's identified a large left paracentral disk protrusion creating severe central canal stenosis at C5-C6 with spondylosis at C4-C5 creating central canal stenosis." (p. 4).[7]

-"On arrival to Westchester Medical Center, Chad Stanbro was noted to have quadriplegia, with no sensation below the collar bone and some rectal tone." (p. 4)

- "At Westchester, Chad Stanbro was diagnosed with an ASIA A Spinal Cord Injury." (p. 5)

- "Chad Stanbro underwent a single level Anterior Cervical Discectomy with Fusion (ACDF) on September 1, 2018. He was found at surgery to have a large disc herniation which was compressive of his spinal cord." (p. 5)

Based on the above, Dr. Todd arrived at the logical, non-speculative, and reliable conclusion that "Chad Stanbro's injury occurred from blunt trauma to the neck while inside the operatory…." (p. 16), a conclusion that not even defendants dispute. Indeed, while the OAG defendants retained their own neurosurgeon, Dr. Douglas Cohen, as an expert witnesses in this case, *see* Dkt. No. 99, Proposed Joint Pre-Trial Order, at 15,[8] and exchanged Dr. Cohen's report with all parties, none of the defendants have submitted Dr. Cohen's report or an affidavit from Dr. Cohen in an attempt to contradict or even call into question the reliability of Todd's findings as to the causal connection between the use of force inside the WMC clinic and the injury to plaintiff's cervical spine.

---

[7] After his return to from Westchester Medical Center to Fishkill, plaintiff was first taken by ambulance to St. Luke's Hospital. After it was determined that he needed a level of care that could not be provided by St. Luke's, plaintiff was medevacked back to Westchester Medical Center.

[8] A Google search reveals that Dr. Douglas Cohen is a neurosurgeon affiliated with Richmond University Medical Center.

B.  Plaintiff endured additional pain and suffering by having his treatment delayed and being transported back to Fishkill in the back of a prison van without any neck immobilization

In support of this opinion, Dr. Todd notes in his report that he relied on, among other things, the following factors, all of which are supported by hospital record entries, plaintiff's history as given to Todd, plaintiff's deposition testimony, defendants' testimony, and videotape footage taken from WMC.

-Instead of being sent to the Emergency Department, his care was delayed while transport from Westchester County Medical Center to Fishkill was completed. This transport occurred without evaluation, immobilization or protection for Chad Stanbro who was handcuffed and seated on a bench in the van for over 90 minutes. (p. 15).

-He was transported back to the prison at Fishkill. He had severe pain *"like an electrical feeling"* that ran from his neck down his arms. He reported that he was unable to move his arms or legs and that he complained bitterly to the staff at the prison. Ultimately it was recognized that there was something wrong and he was transported to the emergency room where it was discovered that he had a serious injury to his spinal cord that required emergency surgery. (p. 7) (emphasis in original).

-The records indicate that over 90 minutes transpired from the time that Chad Stanbro left the Westchester Medical Center at 1:38p.m. until his arrival at Fishkill Correctional Facility at 3:15p.m. (p. 14).

-Nurse Pagliaro's testimony indicates that Chad Stanbro was not strapped or otherwise secured to the bench seat in the van and that he was handcuffed. Further, Nurse Pagliaro reported that Chad Stanbro's neck was not immobilized in any way upon his arrival at Fishkill. (p. 14).

-"Nurse Pagliaro further testified that upon his return, Chad Stanbro had slid out of the wheelchair and was lying on the floor, leading Nurse Pagliaro to believe that Chad Stanbro might have injured himself worse." (p. 3).

Based on the above, Dr. Todd arrived at the logical, non-speculative, and reliable conclusions that "[b]ecause of the delay, Chad Stanbro suffered a more serious injury, experienced a less complete recovery and had several additional hours of pain and suffering" (p. 15), and that "[t]he delay in Chad Stanbro's evaluation, diagnosis and treatment caused unnecessary pain and suffering beyond that which would have been present with timely evaluation" (p.18). Again, defendants have not submitted a report or affidavit from any expert witness calling into question these conclusions.

   C.   As a result of the August 31, 2018 injury to his cervical spine, plaintiff remains more susceptible to paralysis from any future trauma to the cervical spine

In his report, Dr. Todd concludes that, due the severity of the injury to his cervical spine, Stanbro remains more susceptible to paralysis from any future trauma to the cervical spine. As is made clear in his report, Todd's opinion in that regard is not speculative, but rather is based in large part on an event that occurred two years following the August 31, 2018 incident.

Medical and prison records referenced in Todd's report document that in June 2020, plaintiff attempted to hang himself in prison. That incident resulted in a temporary return of the quadriplegia that plaintiff had suffered immediately following the August 31, 2018 incident. Todd's report references prison records documenting that after that incident plaintiff was "unable to move the upper or lower extremities and reportedly had no sensation to the upper or lower extremities. The assessment was Quadriplegia following attempted suicide at prison." (p. 16).

By contrast, in November 2017, one year before the August 31, 2018 incident, plaintiff was found unconscious, hanging in his cell, and had to be cut down by a guard. That early hanging, however, did not result in quadriplegia or other paralysis, and Todd notes in his report that records documented a "normal sensory examination. CTA of the neck was completed and was negative for stenosis, dissection or fracture." (p. 16).

Based on the above, Dr. Todd arrived at the logical, non-speculative, and reliable conclusions that "[h]ad Chad Stanbro not been the victim of the subject incident of August 31, 2018, he would not have developed quadriplegia after the June 2020 attempted suicide as he had a rapid recovery from a similar incident prior to August 31, 2018," and that "[b]ecause of the events of August 31, 2018, Chad Stanbro will always be at greater risk than he would have been due to the blunt trauma and subsequent sequelae." (p. 16).

## CONCLUSION

Based on the foregoing, plaintiff respectfully requests that the motions of WMC, Full, and Weber for an order precluding plaintiff's medical expert, Dr. Robert Todd, from testifying at trial be denied in their entirety.

Dated: New York, New York
      June 14, 2022

SIVIN, MILLER & ROCHE LLP

s/ Edward Sivin
Edward Sivin
Attorneys for Plaintiff
20 Vesey Street, Suite 1400
New York, NY 10007
Telephone: (212) 349-0300
Email: esivin@sivinandmiller.com

19